USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/28/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VINCENT MARCH,
          Plaintiff,

-against-

METRO-NORTH RAILROAD COMPANY,
          Defendant.

16-cv-8500 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, District Court Judge

    Plaintiff, Vincent March ("Plaintiff" or "March") brings this action against the Defendant, Metro-North Railroad Company ("Defendant" or "MTA"), for violations of the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109. Plaintiff claims that he suffered retaliation, in violation of FRSA § 20109(d)(3), when he was removed from service for "insubordination" after reporting a defective wiper blade on one of the trains. (*See* Complaint, ("Compl."), ¶¶ 22-24, ECF No. 1.) Presently before the Court is Defendant's Motion for Summary Judgment on Plaintiff's claim. (ECF No. 24.) For the following reasons, Defendant's Motion is GRANTED.

## BACKGROUND[1]

### I.    The Parties

    MTA is a public benefit corporation, a subsidiary of the Metropolitan Transportation Authority, and operates a commuter railroad in the States of New York and Connecticut. As a mass transit operator, MTA constantly makes employees inspect railroad equipment inside their facility and in the yard before trains are brought into service each day. Crews in the yard inspect trains to

---

[1] The facts are drawn from Defendant's Rule 56.1 Statement of Material Facts, (Def. 56.1, ECF No. 26), Plaintiff's Rule 56.1 Statement of Material Facts, (Pl. 56.1, ECF No. 30), and the exhibits attached to each, unless otherwise noted. They are undisputed, except where indicated.

1

assure everything is safe and functional, including the lights, propulsion, check brakes, and air leakage, among other things.

Plaintiff has been employed by MTA as a machinist since September 3, 2002. Since 2007, Plaintiff has worked as a machinist in Croton-Harmon, New York ("Harmon"). Machinists at Harmon inspect all parts of locomotives, including wheels, seats, windshield wipers, oil levels, and fault logs. In 2015, Plaintiff's primary job was working in the diesel locomotive shop.

## II. August 6, 2015 ("The Incident")

On August 6, 2015, Plaintiff was working an overtime shift under the supervision of Foreman Graham ("Graham") and was tasked with inspecting locomotives. While doing his usual inspection of things like seats, wipers, windshield doors, etc., Plaintiff noticed that "the wiper was distorting" or "contorting" while wiping. (Pl. Dep. at 73-76, ECF No. 25, Ex. 3) Though he could not identify what effect, if any, this contortion was having on the wiper's function, Plaintiff then called his supervisor, Foreman Graham, via radio, to report that he had encountered a defective blade on the engineer side of the locomotive. Graham responded to Plaintiff that he would come to the site to check the blades. Graham then retrieved two replacement blades from a nearby shed, along with a short extension ladder, and drove out to meet Plaintiff.

The parties dispute some of the details surrounding the Incident and what happened next. Plaintiff claims that once Graham arrived with the ladder and wiper blades, Plaintiff saw them and told Graham that he had a "safety concern" about using a ladder to change the wipers. (*Id*. at 80.) In response to Plaintiff voicing his concern, Plaintiff claims that Graham "became cantankerous" and stated "I got 22 years. I got 22 years. I don't give a F-U-C-K about any rules. You find the defect. You fix it. This is how we change wipers in the yard. You're a newbie." (*Id*. at 79.) Plaintiff states that he never told Graham what the safety concern was or why he had it, nor did he request

a good faith challenge form. (*Id*. at 81.) Instead, supposedly due to Graham's cantankerousness, Plaintiff "had to walk away." (*Id*.) Plaintiff claims that he then returned to the cab to finish his inspection for the day. (*Id*. at 82.) He also claims that at some point before he walked away, Graham again told him to fix the blades, saying "I'm giving you a direct order" multiple times and then told Plaintiff: "you are out of service." (*Id*.) Plaintiff is adamant that Graham never offered to "foot the ladder" and that Plaintiff never raised his hand in Graham's direction to "shush" him. (*Id*. at 83.) Plaintiff does state that at some point, he told Graham that, as a mere foreman, Graham lacked the authority to take Plaintiff out of service. (*Id*.)

Defendant presents a different version of the encounter. According to Defendant, on August 6, 2015, Plaintiff was working overtime and asked Foreman Graham, by radio, to come to his location. Graham then went to Plaintiff's location, asked which side the defect was on, looked for a defect, but could not find one. (Graham Dep. ECF No. 31-1 at 33.) Nevertheless, because Graham brought a ladder with him—which he claims was frequently used to fix wiper blades—he asked Plaintiff to fix the wiper blade with the ladder. To this Plaintiff allegedly responded: "I'm not fixing that wiper blade." (*Id*. at 41.) Graham then asked Plaintiff why, in response to which Plaintiff walked away and climbed up in the cab to fill out an ME-9 for a defective wiper blade. (*Id*.) Graham then climbed into the locomotive, operated the wiper and the washer and said: "Where is the defect on this wiper blade?" (*Id*.) At this point, Plaintiff supposedly responded: "That wiper blade is defective," again without explaining how or why. (*Id*. at 42.) Graham then stated: "Show me where the defect is. I don't see a defect" to which Plaintiff, who was still sitting in the conductor seat filling out an ME-9, "kind of put a hand up as if to shush [him]." (*Id*.) After Plaintiff put up his hand, Graham contends that he again asked Plaintiff if he was going to change

3

the wiper blade, at which point Plaintiff again repeated: "I'm not changing that wiper blade." (*Id*.) Defendant claims that Plaintiff never mentioned what his safety concern was.

Defendant contends that Graham then called his supervisor, Kirk Fleming, and told him, "I have a machinist out in the yard. He said he found a defective wiper blade, I found no defect on it." Fleming then purportedly told Graham that if Plaintiff was refusing to fix the blade on the vehicle in the yard, despite it being MTA's past practice to do so, Graham should call the general foreman to see what to do. (*Id*. at 44.) Graham also believes Fleming said something along the lines of it taking only about two minutes to fix such wipers by ladder. (*Id*.)

Graham claims that he offered to assist Plaintiff with changing the blade by setting up the ladder and handing him the necessary tools. (Def. 56.1 ¶44.) He also contends that he offered to "re-spot" the train and move it to another platform in order to allow Plaintiff to change the blade while standing on a platform next to the train. (*Id*. ¶46.) But because Plaintiff kept refusing to talk to or comply with Graham's direct orders, Plaintiff and Graham ended their discussion. (*Id*. ¶50.)

### III. Plaintiff Reports the Safety Incident Up

After Plaintiff's quarrel with Graham, Plaintiff filled out a standard ME-9 slip relaying what he believed to be wiper defect. (*See* ECF No. 25-1.) Again, it is undisputed that Plaintiff never asked for nor completed a good faith challenge form. Subsequently, Plaintiff met with Joanna Kelly, a more senior supervisor than Graham, whom Graham had contacted. Kelly testified she told Plaintiff it was standard practice to change wiper blades in the yard and that he would be removed from service if he refused again. At this point, Plaintiff again refused to change the wiper blades in the yard. Kelly then informed Plaintiff that he was being removed from service for insubordination.

Plaintiff then informed Kelly that he had written up a defective wiper slip, and that he believed it was unsafe to use a ladder to change the wiper blade. Subsequently, Graham and Kelly together inspected the wiper blade in Locomotive 207 and concluded that it was operational and with no defects. Kelly testified that she then returned to her office and informed her supervisors about the incident with Plaintiff.

### IV. Use of a Ladder to Change Wiper Blades

Defendant claims that wipers are rarely changed in the yard "not because it is a dangerous task, but because they are usually changed during more in-depth inspections that occur in the Harmon shops." Defendant adds that sometimes wiper blades need to be changed in the yard and Graham, other supervisors, and machinists have changed wiper blades there with a ladder.

Plaintiff agrees that wipers are rarely changed in the yard and are usually changed in the shops but disputes that this is because more in-depth inspections occur in the shops. (Pl. 56.1 ¶62.) Other than one instance, when Graham changed a wiper blade in Harmon Yard years before 2015, Plaintiff claims that he has never seen a wiper blade changed in the yard. He claims that the proper way to change the blades is by using a lift because the front windshields of the locomotives are between 11 and 13 feet above the concrete pads on the tracks the yard. Thus, to change the wiper blade, an employee would have to be over six feet off the cement pad. (Pl. 56.1 ¶¶ 37-38.) It is undisputed that in August 2015, MTA had no lifts in the yard.

Plaintiff also testified that he believes using a ladder to change the wiper blade would violate MTA safety rules because if an employee has to go up a ladder with things in hand, and is working, the employee cannot have three points of contact, as required under MNR General Safety Instruction 300.5.[2] (Pl. 56.1 ¶69.)

---

[2] MNR General Safety Instruction 300.5 states: "follow these guidelines to avoid slip, trip, and fall hazards…Maintain a three-point contact (two hands and a foot or two feet and a handhold) when getting on or off of equipment or ladders."

5

Vincent DiRenno, who was in charge of managing the work force, equipment and facilities, and whose responsibilities included employee safety, also testified that wiper blades can be changed in the yard using a ladder. DiRenno also testified that although three-point contact is required while climbing ladders, an employee may change a wiper without violating the rule because the materials needed can fit in a pocket. Similarly, Fleming testified that he believed it was fine for employees to change wipers using ladders, though going forward, he expects his employees to use a lift while changing blades in the yard because now, the MTA has purchased a lift for the yard. He further testified that Occupational Safety and Health Administration ("OSHA") does not require fall protection for workers using portable ladders. He believes this makes sense for situations like the present, where a locomotive windshield is only about 11 feet off the ground—meaning that an employee would only need to be a few feet off the ground to reach it.

## V. Good Faith Challenge

A "Good Faith Challenge" is the established method for MTA Employees to raise a safety concern related to a job assignment, and it provides procedure for resolving concerns. If an employee makes a Good Faith Challenge to an instruction, a supervisory panel goes out, studies the task, and determines whether or not there is a safety issue. If there is a safety issue, the issue is corrected, or equipment is moved to a location where the employee feels safe performing the task. Further, if an employee makes a Good Faith Challenge, that employee is protected from discipline for refusing to perform the work until the challenge is completed.

Plaintiff does not dispute that he was trained on how to make a Good Faith Challenge and knew about the procedure. He also does not dispute that employees making Good Faith Challenges are immune from disciplinary action. Rather, he disputes that the Good Faith Challenge procedure applied to the Incident because it "only applies to 'the right to challenge in good faith, any directive

that would violate MNR Rule or instruction in [a limited set of safety-related] areas…'" which would not apply to his challenge to Foreman Graham's directive to change the wiper blades. Plaintiff also argues that a Good Faith Challenge does not abridge any rights or remedies available to him under federal law or his collective bargaining agreement. ("CBA"). Finally, Plaintiff claims that he effectively made a Good Faith Challenge, but that in response to it, no MTA personnel ever examined whether there was a safety issue with using a ladder in the yard.

## VI. Disciplinary Hearing and Appeal Process

On August 11, 2015, MTA sent Plaintiff a letter advising him of the disciplinary charge against him and setting a date for a disciplinary hearing. The hearing took place on September 24, 2015. At this hearing, Plaintiff was represented by two union officials, and a third acted as an observer. Plaintiff presented witnesses, cross-examined witnesses, presented evidence, and examined all evidence brought against him. At the hearing's conclusion, Kirk Fleming imposed a 45-day deferred suspension on Plaintiff.

Although Defendant claims that Fleming largely made the decision independently, Plaintiff claims that Fleming was strongly influenced in his decision by DiRenno, who encouraged disciplining Plaintiff through a deferred suspension. (Pl. 56.1 ¶ 87.) Plaintiff appealed the decision to the Metro-North Labor Relations Department, who then modified the suspension from forty-five days to two and issued a wage reimbursement for Plaintiff's lost days. Plaintiff disputes the Labor Department's conclusion, arguing that he was only reimbursed for one of three lost days. (Pl. 56.1 ¶ 88.)

**LEGAL STANDARDS**

I. **Summary Judgment**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; s*ee also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250. Summary judgment should be

granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

## II. Federal Railroad Safety Act

The FRSA was enacted to promote safety in railroad operations and reduce railroad-related accidents and incidents. 49 U.S.C. § 20101. The FRSA prohibits a railroad from retaliating against employees for (a) reporting, in good faith, a hazardous safety or security condition; or (b) refusing to work when confronted by a hazardous safety condition, in certain circumstances. 49 U.S.C. § 20109(b).

The FRSA follows a burden shifting test to determine whether a whistleblower action is protected. First, to establish a *prima facie* claim under the FRSA:

> an employee must demonstrate by a preponderance of the evidence that (1) she engaged in a protected activity, (2) the employer knew of that activity, (3) she suffered an adverse employment action, and (4) the protected activity was a contributing factor in the decision.

*Dendy v. Nat'l R.R. Passenger Corp.*, No. 14-CV-8381(JPO), 2016 WL 3198304, at *2 (S.D.N.Y. June 8, 2016). Next, "[i]f the employee establishes the prima facie case, the burden then shifts to the employer to demonstrate 'by clear and convincing evidence' that it would have taken the same action in the absence of the protected activity." *Conrad v. CSX Transportation, Inc.*, 824 F.3d 103,

107 (4th Cir. 2016). Failure to satisfy any one of the *prima facie* requirements is fatal to a claim. *Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017). While a plaintiff does not have to provide proof of the employer's motive, "at bottom, the essence of a retaliation claim under the FRSA is 'discriminatory animus.'" *Lockhart*, 266 F. Supp. 3d at 663. Because the employee need not establish pretext by a preponderance of evidence, the FRSA burden shifting framework is marginally easier for plaintiff-employees to satisfy than the framework under *McDonnel Douglas*. *See Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 159 (3rd Cir. 2013).

**DISCUSSION**

Defendant argues that Plaintiff's claims must be dismissed because he cannot meet his burden of proof for any element needed to make a *prima facie* retaliation claim. Specifically, Defendant emphasizes that Plaintiff did not engage in protected activity and, even if the court believes he did, Plaintiff was never disciplined for such activity—but rather, was disciplined for insubordination in refusing to comply with all his supervisor's requests. Plaintiff argues that he has established a *prima facie* case of retaliation and that Defendant cannot prove, by clear and convincing evidence, that it would have taken the same adverse actions against Plaintiff in the absence of Plaintiff's protected activity.

The Court agrees with Defendant in both regards. It finds that Plaintiff cannot establish a *prima facie* case and that his discipline was for insubordination, not for reporting or refusing to complete an unsafe task.

**I.     No Proof of Protected Activity**

Defendant's main issue with Plaintiff's *prima facie* case is that Plaintiff has failed to prove that he engaged in a protected activity in the first place. They correctly note that to state a claim

for retaliation under the whistleblower provision of the FRSA, 49 U.S.C. Section 20109, he must show that he engaged in a protected activity, by doing one of the following three actions:

> (1) providing information pertaining to the investigation of or proceeding about a violation of safety regulations; 2) reporting, in good faith, a hazardous safety or security condition or refusing to work around a hazardous safety condition, and (3) requesting medical treatment for a work-related injury.

49 U.S.C. § 20109 (a)-(c). Plaintiff does not specify under which condition he is bringing this suit, but the Court finds that there is no basis for the third option. Plaintiff's claim is essentially that MTA retaliated against him after he reported a defect in a windshield wiper and refused to climb a ladder to fix the reported defect. Therefore, the Court finds that his claim does not pertain to the first option—investigating a proceeding about the violation of safety regulations. *See Hernandez v. Metro-North Commuter R.R.*, 74 F.Supp. 3d 576 (2015). This leaves only the second option as the basis for Plaintiff's adverse employment action. It is, however, still deficient.

To prove that he engaged in a protected activity, as understood under § 20109 (b)(1)(A). Plaintiff must "report[ ], in good faith, a hazardous safety or security condition[.]" 49 U.S.C. § 20109 (b)(1)(A). The parties dispute whether the language of the statute requires only the subjective belief that there was a hazardous condition, (*see* Pl. Mem. in Opp. at 11-12, ECF No. 29), or whether it requires both a subjective believe and one that is *objectively reasonable*. (*See* Def. Mem. at 2, ECF No. 33.)

The Court finds the latter interpretation to be correct. While the Second Circuit has not yet directly ruled on this issue, several other circuit courts have found Defendant's interpretation in line with the FRSA's text, history, and purpose. Plaintiff cites to *Cheek v. United States*, 498 U.S. 192, 111 S. Ct. 604 (1991) for the proposition that "good faith belief" only requires a subjective belief of fraudulent activity. But, as Defendant notes, *Cheek* was a case interpreting the tax code and tax fraud, whereas several circuits have held that the FRSA was modeled after other federal

whistleblower statutes, such as the False Claims Act and Sarbanes Oxley, in which a "good faith" belief" includes an objectively reasonable component.

This Court agrees with the conclusion of those circuits. *See e.g.*, *Lillian v. Nat'l R.R. Passenger Corp.*, 259 F. Supp. 3d 837, 843 (N.D. Ill. 2017) (citing *Lang v. Nw. Univ.*, 472 F.3d 493, 495 (7th Cir. 2006)) ("As stated earlier, the [FRSA] protects an employee from adverse action when reporting, in good faith, a hazardous safety or security condition. Our Court of Appeals has held that "good faith," as that concept was at issue in a different whistleblower statute, contains both a subjective and an objective component"); *See also Conrad v. CSX Transportation, Inc.*:

> Like other federal whistleblower statutes, the FRSA is governed by the burden-shifting framework set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR–21"). *See id.* § 20109(d)(2)(A)(i); *see also, e.g.*, 18 U.S.C. § 1514A(b)(2)(C) (Sarbanes–Oxley Act) (incorporating the rules and procedures of AIR–21); 42 U.S.C. § 5851(b)(3) (Energy Reorganization Act) (same).

824 F.3d 103, 105 (4th Cir. 2016). Further, in whistleblower claims brought pursuant to other statutes, the Second Circuit Court of Appeals has determined that a "reasonable belief contains both subjective and objective components." *Nielsen v. AECOM Tech. Corp.,* 762 F.3d 214, 221 (2d Cir.2014) (citation omitted) (explaining that a plaintiff must "show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation.") (quoting *Livingston v. Wyeth, Inc.,* 520 F.3d 344, 352 (4th Cir.2008)). Therefore, to establish the first element of a *prima facie* claim, Plaintiff must establish that his good faith belief in a safety hazard was subjectively *and* objectively reasonable.[3]

---

[3] The Court agrees with Defendant that it is appropriate for it to determine what was objectively reasonable insofar as it is relying on undisputed facts. *See e.g., Hernandez v. Metro-N. Commuter R.R.,* 74 F. Supp. 3d 576 (S.D.N.Y. 2015); *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (in context of qualified immunity, it was appropriate for court to determine whether "defendant official's conduct was objectively reasonable" as a matter of law).

While Plaintiff may have subjectively believed there was a safety risk with the blade and with using the ladder to fix it, Plaintiff fails to support that his beliefs were objectively reasonable.

Starting with the supposedly deficient wiper blade, Plaintiff never identifies what he believes the flaw with the wiper blade was. Beyond testifying that it was "bending" or "distorting" while in operation, he never identifies whether it had any negative functional effect—i.e., whether it could not clear the window, remove wiper fluid, or otherwise clean it. (Pl. Dep. at 75-76.) Further, it is undisputed that during his exchange with Graham and subsequent conversation with Kelly, he never relayed what the precise issue or defect with the blade itself was. (*See* Pl. 56.1 ¶¶ 39-53.) Nor did he ever provide any material explanation of the defect in the contemporaneous ME-9 slip. (*See* ME-9, ECF No. 31, Ex. 7.) Further, multiple supervisors, including Graham and Kelly, then inspected the blades and could not find a defect, despite their personal knowledge and years of experience in identifying safety hazards on locomotives.

Turning to the objective reasonableness of Plaintiff's refusal to use the ladder to fix the blade, while there are a few facts in dispute, the Court finds that there are enough undisputed facts to support that it was not objectively reasonable for him to refuse to change the wiper. For example, the parties dispute whether Plaintiff merely told Graham that he had "a safety concern" or whether he went so far as stating: "I got a safety concern about using an extendable ladder to change the wipers." (*See* Pl. 56.1 ¶¶ 39-48.) The parties also dispute whether Graham offered to foot the ladder and offer support as well as how high off the ground Plaintiff would have to be to reach the blade.

What is undisputed is that: 1) Graham took Plaintiff's report of the blade issue seriously enough to arrive on site immediately with a ladder and new blades, 2) Graham tried to converse with Plaintiff and ascertain what the blade issue was to no avail, 3) Graham believed that there was precedent for fixing blade issues with a ladder, 4) Plaintiff never went into any details as to

13

why he felt there was a safety concern with using a ladder to fix the blades, 5) Plaintiff never requested or pursued a good faith challenge regarding his concern about using the ladder, and 6) Plaintiff never said anything beyond his vague "safety concern" before walking away because Plaintiff supposedly felt that Graham had been "cantankerous." (*See id*. Pl. Dep. at 79-81.) The parties also agree that 7) Graham made a call to Fleming to relay the situation and report that nothing seemed to be wrong with the blade and 8) Plaintiff subsequently met with Kelly who again asked Plaintiff if he was going to change the blades, which he refused to do. (Pl. 56.1 ¶¶ 51-53.)

The Court finds that on these facts, it was not objectively reasonable for Plaintiff to refuse to fix the safety wipers. Plaintiff never identified what was wrong with the wipers on the day of the Incident, nor subsequently, during this litigation. He even testified that he could not recall if he tested the wiper with any fluid to see if the blade could still clean the window. (Pl. Dep. at 76.) He similarly never explained what his safety concern with the ladder was—and only said that he had "a safety concern" with it. A vague remark that something is dangerous without any explanation about how or why does not reflect good faith or objective reasonableness. *See Lang*, 472 F.3d at 495 (affirming district court's decision that plaintiff "played the part of Chicken Little" by imagining fraud with no reasonable basis or proof behind her belief).

Further, at least four of Plaintiff's supervisors testified that, while not frequent, it was standard for employees at MTA to use ladders to make minor fixes on locomotives. (*See* Pl. 56.1 ¶¶ 69-79) (relaying that Kirk Fleming, Vincent Direnno, Joanna Kelly, and William Graham all testified that they believed it was safe to perform the wiper placement using a ladder.) Moreover, the record is replete with evidence of Plaintiff's refusal to engage in any conversation about his safety-related belief. (*See* Pl. Dep. at 77-83) (reflecting that Plaintiff never explained: why he thought using the ladder was dangerous, what rule he thought using the ladder would violate, why

14

he felt he might get hurt, or what alternative could work); (Direnno Dep. at 17, ECF No. 32-2, Ex. 16) (explaining Plaintiff's history and behavior pattern of walking away, refusing to change parts, failing to tell people why he believed things were defective, and failing to replace supposedly defective items when asked); (Disciplinary Hearing Memorandum, ECF No. 31-20) (reflecting that Plaintiff behaved obstinately and uncooperatively during the Incident and at the Disciplinary Hearing when he abruptly announced that he would be leaving early and did so in the middle of testimony without offering an explanation or seeking a postponement); (Graham Dep. at 40-41, 43, ECF No. 25, Ex. 6) (relaying Graham's testimony that when he asked Plaintiff to fix the wiper blade, Plaintiff refused to do it, walked away from the conversation rather than participate in it, and then raised his hand to "shush" Graham.); (Kelly Dep. at 61) ("He did mention that it was unsafe. He didn't explain to me why, and he didn't say that he was doing a good faith challenge.").

Plaintiff's obstinate behavior on August 6, 2015 was particularly problematic because, as Defendant points out, a refusal to engage in a particular activity can only be "in good faith" when "no reasonable alternative to the refusal is available to the employee." 49 U.S.C. § 20109(b)(2). Here, Plaintiff later admitted that another method to fix the blade would have been by using a hatch or by moving the train to another track. (Pl. 56.1 ¶ 82). But because Plaintiff refused to converse on the subject, he did not establish that there was no reasonable alternative but to refuse the task.

Not only does the record show that Plaintiff was obstinate and uncooperative with Graham when Graham arrived at the track, but it shows that Plaintiff was obstinate with Kelly when he met with her and she again asked him if he would be willing to fix the wiper blades. (Pl. 56.1 ¶¶ 53-54.) The record even reflects that Plaintiff had previously made a similarly vague complaint and that he was hostile and uncooperative during his Disciplinary Hearing.

In sum, Plaintiff has adduced insufficient evidence to show that he was being objectively

reasonable in refusing to use the ladder. While he has provided an article about the danger of falling from ladders, (*see*, ECF No. 31, Ex. 12), and a segment of MTA's rules requiring three points of contact (MTA Safety Manual, ECF No. 31, Ex. 18), the overwhelming evidence, including his own testimony, shows that he was being persistently difficult, vague, and uncooperative and that there was no urgent or imminent threat of danger posed by the blade.

Lastly, Plaintiff admitted that he knew of and was trained on MTA's good faith process and never sought to avail it, even though it would have protected him from disciplinary action. (Pl. 56.1 ¶¶ 9-10, 57.) Plaintiff's discounting of the proper procedure for handing such complaints further cements the Court's finding that Plaintiff's refusal to use the ladder did not constitute an objectively reasonable safety concern. Accordingly, Plaintiff has fatally failed to establish that he engaged in a protected activity under the statute as is required for a *prima facie* claim.

## II. No Discriminatory Animus

Even if one found that Plaintiff's conduct was protected activity under the statute, the Court finds that Plaintiff has failed to adduce sufficient proof in support of the fourth element necessary for a *prima facie* claim—that the protected activity was a contributing factor in the decision to terminate Plaintiff.

Both parties agree that in order for Plaintiff to make out a successful claim, he must establish, by a preponderance of the evidence, that retaliation was "a motivating factor" or "a contributing factor" in his termination. (*See* Def. Mem. at 16-17; Pl. Opp. at 14-15.) The parties agree that there is no precise formula for how Plaintiff must do this. He can do it by demonstrating temporal proximity or otherwise. At the heart of the inquiry, however, is whether there is sufficient evidence for a trier-of-fact to conclude that there was a retaliatory animus underlying Plaintiff's adverse action. *See Lockhart*, 266 F. Supp. 3d at 663 (explaining that while a plaintiff does not

have to provide proof of the employer's motive, he must make a showing of some retaliatory animus).

The Court finds that even if Plaintiff had engaged in protected behavior, an employer would not liable for retaliation "if it can prove 'by clear and convincing evidence' that it 'would have taken the same unfavorable personnel action in the absence of that [protected] behavior.'" *Gutierrez v. Norfolk & S. Ry. Co.*, No. 12 C 2396, 2014 WL 551684, at *4 (N.D. Ill. Feb. 12, 2014); *see also Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969-70 (8th Cir. 2017) ("An employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that an employee committed misconduct is a legitimate, non-discriminatory reason for adverse action.")

Here, Plaintiff has not adduced sufficient proof to connect his termination to his safety complaint. There is no hard evidence that MTA disciplined Plaintiff for reporting the defective blade. To the contrary, Plaintiff had made the exact same type of complaint, accompanied with a written slip, one month earlier and was never formally disciplined, (Pl. 56.1 ¶¶ 23-27; Direnno Dep. at 17.) When Plaintiff made the same type of complaint on August 6, 2015, Foreman Graham immediately grabbed a ladder and blade to meet Plaintiff at the track and fix it. (*See* Graham Dep at 39-40.) In other words, MTA took Plaintiff's complaint seriously in both instances. The only difference between the two instances was Plaintiff's blatant insubordination and uncooperativeness on August 6, 2015, in response to which he was dismissed.

In addition, the timeline does not support Plaintiff's argument. Kelly's decision to send Plaintiff home had nothing to do with whether the blade was deficient, as she did not even inspect the blade until after Plaintiff left. (Graham Dep. at 49-50; Pl. 56.1 ¶¶ 56-60.) Indeed, she testified

17

that she terminated him upon his repeated refusal to fix the blade or otherwise cooperate with her when they met. (*See* Kelly Tr. at 17-22, ECF No. 31-5, Ex. 5.)

Defendant has demonstrated, by a preponderance of evidence, that Plaintiff's termination was attributable to his insubordination above all else. For example, he admits that Kelly told him during their discussion that he was being terminated for insubordination after he refused to fix the blades. (*See* Pl. 56.1 ¶¶ 55-57). Indeed, Kelly testified about the conversation in which she terminated Plaintiff for insubordination, relaying:

> I spoke to Vincent March. I asked him if he was going to change the wiper blades, and he said no. And I said, why not? He said that it was unsafe. I told him that his Foreman instructed him to replace the wiper blades and this was standard practice in the yard. And I told him that he would be out of service if he wasn't going to change the wiper blades. He said he wasn't going to change them and I said he was out of service.

(Kelly Dep. at 17, ECF No. 25, Ex. 7.) She also relayed "He was uncooperative. He was determined that he wasn't going to change the wiper blades, I kept going around in circles with him, so I took him out of service because both him and the Foreman were worked up and I didn't see a good work relationship between the two of them." (*Id*. at 60-61.) Graham's testimony corroborates Kelly's account. (*See* Graham Dep. at 70.; Graham email dated Aug. 06, 2015, ECF No. 25, Ex. 12.) Further, upon the conclusion of Plaintiff's Disciplinary Hearing in which Plaintiff and Defendant presented evidence and witnesses, Fleming relayed that he made the decision to implement a 30-day suspension against Plaintiff due to his persistent insubordination:

> **Summary of Testimony**
>
> …CP did not suggest alternative methods to accomplish the assigned task, he simply refused to do the work. Moreover, CP's demeanor at the hearing was confrontational and at 3:35 pm he announced that he would be leaving at 3:55 pm without offering a reason why or explaining why he did not ask for a postponement. At 3:55, after only a few minutes of testimony, he abruptly left the proceedings.

18

CP was charged with insubordination for refusing a direct order to change windshield wipers on Engine 207.

**Recommended Penalty**

...CP did not suggest alternate ways to change the wipers, and his demeanor at the time was assessed by General Foreman Kelly as insubordinate, uncooperative and detrimental to the workplace. His behavior at trial was consistent with that description. For these reasons, the recommended penalty in this matter is a 30 day suspension.

(Disciplinary Hearing Memorandum at 2, ECF No. 31-20.)

Accordingly, Plaintiff has failed to establish two necessary elements for a *prima facie* retaliation claim under the FRSA. Failure to establish even one element is fatal. Consequently, Defendant's Motion for Summary Judgment on Plaintiff's claim is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendant's Motion is GRANTED in its entirety. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 24, terminate the case, and enter judgment in favor of the Defendant.

Dated: March 28, 2019
       White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge